HERMAN DITTMAR, PLAINTIFF-RESPONDENT, v. CONTI-
NENTAL CASUALTY COMPANY, DEFENDANT-APPEL-
LANT.

Superior Court of New Jersey
Appellate Division

Argued May 5, 1958—Decided June 20, 1958.

594

Before Judges GOLDMANN, FREUND and CONFORD.

*Mr. Victor S. Kilkenny* argued the cause for appellant (*Mr. George D. McLaughlin,* attorney).

*Mr. Albert Kushinsky* argued the cause for respondent (*Messrs. Kushinsky & Muccifori,* attorneys).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D.   Defendant appeals from a judgment of the Superior Court, Law Division, sitting without a jury, determining that plaintiff is totally disabled within the terms and meaning of its business and professional accident and sickness policy; that he is entitled to recover $1,995.50, representing total disability benefits of $100 per month from December 25, 1955 to June 25, 1957, inclusive of interest, plus the balance of hospital indemnity owed plaintiff under the policy; and that commencing June 25, 1957 defendant must pay him the sum of $100 per month so long as he may live.   Defendant also appeals from the court's denial of its motion for a new trial.

The policy was issued April 21, 1954.   The provisions pertinent to our inquiry are those contained in Part III of the policy, "Monthly Accident Indemnity," which reads:

"A. TOTAL DISABILITY. When, as the result of injury and commencing while this policy is in force, the Insured is *wholly and continuously disabled and prevented from performing each and every duty pertaining to his occupation*, the Company will pay the Monthly Indemnity stated in the Schedule for the period the Insured is so disabled, not to exceed twelve consecutive months. Subject to the 'Maximum Period Total Disability Accident Indemnity' stated in the Schedule and after the payment of Monthly Indemnity for twelve months as aforesaid, the Company will continue the payment of Monthly Indemnity so long as the Insured is *wholly and continuously disabled and prevented by reason of said injury from engaging in each and every occupation or employment.* * * *

B. PARTIAL DISABILITY. When, as the result of injury and commencing while this policy is in force or immediately following a period of total disability for which indemnity is payable under Paragraph A of this Part, the Insured is *continuously disabled and prevented from performing one or more of the important duties of his occupation*, the Company will pay forty per cent of the Monthly Indemnity stated in the Schedule for the period of such disability, not to exceed three consecutive months as the result of any one accident."
(Italics ours)

The policy also provided for hospital indemnity at the rate of $100 a month for a period not exceeding three months for any one accident.

Plaintiff's application for the policy stated that his present occupation was "Electrical contractor," his duties "Working Contractor," and that he was self-employed.

On April 9, 1955 plaintiff accidentally fell into a gasoline fire, sustaining severe and extensive burns, particularly to his right hand and arm. He was hospitalized for more than 50 days and required two operations and two skin grafts. As a result of the accident, plaintiff's right arm is totally useless. Defendant paid plaintiff total disability benefits of $100 per month until December 25, 1955, together with $190 on account of hospital indemnity. It refused to make further monthly payments or to pay the $110 balance for the hospital indemnity, ostensibly because it felt plaintiff was no longer wholly disabled having resumed the management of his business. Plaintiff thereupon sued to recover past-due monthly indemnity from December 25, 1955 and the $110 balance of hospital indemnity, and further demanded judgment that defendant continue to pay him $100 a month so long as he

may live. The defense was that plaintiff's alleged loss did not come within the coverage of the policy and that under its terms and in the light of proofs submitted, he had been tendered the full amount due him, if any, for his alleged disability.

Plaintiff was 48 years old at the time of the trial and had been in the electrical business for 32 years. He left eighth grade to go to work for his father, an electrical contractor; he did only physical work, having nothing to do with management. When his father died in 1950 he continued the conduct of the business. Plaintiff testified that he would go out on various jobs with his men, working right along with them while he supervised what they were to do. He employed one man and sometimes two, depending on the work load, and he himself did all the work on weekends and in emergencies. He also performed all the managerial duties of the business, previously discharged by his father, such as soliciting jobs, estimating, purchasing supplies, checking on complaints, etc., with the assistance of a cousin who was his secretary.

Since the accident plaintiff cannot use his right arm in any way and therefore cannot perform the physical work of electrician which he had been accustomed to doing when he was out on jobs with his employees. This is not disputed. Medical witnesses testified that the arm is permanently injured; further medical or surgical treatment will not result in improvement. Otherwise, plaintiff's faculties are unimpaired. His doctors concede that he can supervise and direct his business—he can do everything generally associated with management, barring the physical use of his right arm. It was testified that plaintiff cannot remain outside in either very cold or very hot weather because of skin impairment. In the cold his arm becomes numb and pains him; in hot weather the arm burns and stings because of the absence of sweat glands.

Plaintiff returned to his business in November 1955, some seven months after the accident. He has continued in the electrical contracting business since, doing a limited amount

of supervisory work on the outside and otherwise managing and running the business with the help of the secretary and also his wife, who takes care of the payroll and makes out his checks. He admitted that he makes money, but does not earn as good a living as he did before the accident.

The trial court, after denying defendant's motion to dismiss, concluded that plaintiff did not have to be absolutely helpless but that his inability to perform the function of a working electrician, a substantial element of his business, was sufficient to make him totally disabled within the terms of the policy. The judgment under review was then entered. Defendant's motion for a new trial on the ground that the judgment was against the weight of the evidence and incorrect because not in accordance with the provisions of the policy was denied.

On appeal defendant asserts that the trial court's determination was wrong as a matter of law, was against the weight of the evidence, and amounted to an unconstitutional impairment of the obligations of the contract between the parties. It also argues that if the court's findings are correct, plaintiff is not entitled to a judgment of $100 per month for the rest of his life, but only for so long as the total disability lasts, as determined by periodic examinations.

Part III of the policy contains three separate and distinct conditions for disability payment, the first two relating to total disability and the third to partial:

(1) Total disability payments for not exceeding 12 consecutive months where the insured is "wholly and continuously disabled and prevented from performing each and every duty pertaining to his occupation." (Clause A)

(2) Thereafter, total disability payments so long as the insured is "wholly and continuously disabled and prevented by reason of said injury from engaging in each and every occupation or employment." (Clause A)

(3) Partial disability following the injury or a period of total disability where the insured is "continuously disabled and prevented from performing one or more of the important duties of his occupation." (40% rate, Clause B)

This appeal may not be resolved by a simple resort to the broad language of the insurance texts and legal cyclopedias, which generally point in the direction of a liberal construction of policy provisions dealing with occupational disability. See, for example, 1 *Appleman, Insurance Law and Practice* (1941), § 671, *p.* 829, *et seq.* In every case the question of whether the insured is entitled to total or partial disability payments depends on the precise language of the contract defining the disability. The contrasting language of one clause in a policy may illuminate the intent of other clauses. No better illustration of this can be found than the very cases cited by plaintiff in support of his judgment.

Plaintiff, like the trial court, refers to *Gross v. Commercial Cas. Ins. Co. of Newark,* 90 *N. J. L.* 594 (*E. & A.* 1917), and *Booth v. U. S. Fidelity and Guaranty Co.,* 3 *N. J. Misc.* 735, 130 *A.* 131 (*Sup. Ct.* 1925). Reference to these cases might be apt were we dealing here with a policy containing only the first of the three quoted clauses. In *Gross* the language of the policy was, "shall be totally disabled and wholly and continuously prevented from performing any and every kind of business pertaining to his occupation." Gross was a traveling salesman and was unable to pursue his occupation because of a severe foot ailment which made travel impossible. He sometimes went to the office by auto and while there occasionally dictated a letter. The trial court instructed the jury that the reasonable construction to be put upon the language was not that plaintiff must be so disabled as to prevent him from doing anything whatsoever pertaining to his occupation, but that if he should be so disabled as to prevent him from doing any and every kind of business pertaining to his occupation, he was entitled to recover. Judgment went in plaintiff's favor. On appeal the court found the charge correct, holding that the proofs were sufficient for the jury to infer that the principal part of plaintiff's occupation was traveling, where the use of his feet was absolutely necessary, and because of his peculiar illness he was disabled from performing the principal and major part of his occupation.

In *Booth* the policy provided for full indemnity if the accidental injury did "continuously and wholly disable and prevent the insured from the date of the accident from performing any and every kind of duty pertaining to his occupation." Another provision called for partial indemnity if the accident was such as to "continuously disable and prevent him from performing one or more material daily duties pertaining to his occupation." Booth was a ship surveyor and inspector who accidentally fell in the course of his duties and struck his head and chin. Although he suffered dizziness, blurred vision, and loss of association of ideas, he went to his place of employment and tried to perform his duties, but the quality of his work was bad and grew progressively worse. About a month after the accident he became semiconscious, lost his voice, and suffered paralysis of the right side. An operation for decompression of the brain followed. There was total breakdown and total incapacity. Defendant claimed that Booth was not wholly disabled because he performed some of the duties of his occupation until he became paralyzed. The court held that the fact plaintiff had tried to work was not to be taken as conclusive evidence of his ability to do so and that he was continuously and wholly disabled from the date of the accident, citing the *Gross* case.

Neither *Gross* nor *Booth* are applicable on the facts or in the context of the present policy.

Strong reliance is placed upon *Nickolopulos v. Equitable Life Assurance Society,* 113 *N. J. L.* 450 (*E. & A.* 1934), but here again we find the cited authority without pertinence. The policy there read that disability would be deemed total when it was of such an extent that the insured was prevented "from engaging in any occupation or performing any work for compensation of financial value." Plaintiff, who read little English and could write only his name, was in the confectionery business and owned a store building and small apartment house. He contracted osteomyelitis, which caused his leg bones to die and rot away. He was confined to the hospital for nine months and had to sell his business. Thereafter he had to use crutches and underwent operations and

continuous treatment. The defense was that plaintiff had some use of his leg and "there were some things he could do, if he could receive such employment"; therefore there was no total disability. The jury found for plaintiff and the resulting judgment was affirmed on appeal. The Court of Errors and Appeals held that the trial court was justified in its charge in construing the language of the policy to mean "from performing any work for compensation of financial value in his regular business and any other pursuit for which he [plaintiff] was qualified, and which he would reasonably be contemplated to pursue." It said that the insured need not be absolutely helpless; "If an assured has totally lost his ability to earn money in the only way he can, if he is totally unfit and unable to do the only work he knows, he is totally disabled, at least until some new ability to earn his living is created." The appellate court stressed plaintiff's illiteracy and that his only occupation had been that of candymaker. The present case presents neither the policy provisions nor the physical condition of *Nickolopulos*.

We next construe *Woodrow v. Travelers Ins. Co.*, 121 *N. J. L.* 170 (*E. & A.* 1938), relied on by the trial court. The only policy provision there involved was one providing that the total disability insurance coverage of any employee of the A & P Company under the master policy issued by Travelers would remain in force if, at the time of termination of employment, the employee was "wholly disabled and prevented by bodily injury or disease from engaging in any occupation or employment for wage or profit." At the time Woodrow left A & P's employ in January 1935 he was suffering from chronic nephritis, admittedly incurable and progressive. He died four months later, but meanwhile he attempted some door-to-door selling and gave a friend some assistance in establishing a grocery department in his store. The medical testimony was that when he left his employment he was incapable of doing a hard day's work or to perform his duties in managing the A & P store. Relying upon the language of the policy and the *Gross, Booth* and *Nickolopulos* cases, the court held that in the circumstances

Woodrow did not forfeit his total disability benefits. It specifically observed that the action was not one for benefits under an accident policy but was concerned simply with a physical state made a condition for the continuance of coverage. The case is clearly distinguishable.

We are referred to *Shaffer v. Metropolitan Life Ins. Co.,* 133 *N. J. L.* 53 (*Sup. Ct.* 1945), where the total disability provision of the policy read: "permanently, continuously and wholly prevented thereby [accidental injury or disease] from performing any work for compensation or profit." There was testimony that plaintiff, prior to his discharge in 1932 from his job as storekeeper was in bad physical condition and unable to perform his usual duties. The medical testimony was that he was unable to do any work and was totally and permanently disabled from and after 1930 when he contracted lobar pneumonia. There was also testimony that following release from the hospital and return to his job he was unable to perform physical work but could sit in a chair and direct his assistants. Following his discharge he did no work for five or six years; he then sought several positions and finally became superintendent of an apartment house, but did not perform physical labor. The court held that the jury could have determined that plaintiff's lung condition had grown progressively worse and that, prior to the termination of his employment, he was wholly and permanently disabled from following a gainful occupation. In light of the language of the policy, he met the test of being "prevented from performing any work for compensation of financial value in his regular business and in any other pursuit for which he was qualified and which he could reasonably be contemplated to pursue," quoting from the *Nickolopulos* case. Here, again, we have neither the policy provisions nor the physical condition present in this case.

Our present Supreme Court had occasion to review the *Gross, Booth, Nickolopulos* and *Woodrow* cases in *Kazala v. Prudential Ins. Co.,* 12 *N. J.* 75 (1953), where Kazala claimed disability benefits from October 24, 1951 to March 6, 1952 for alleged disability under Prudential's private dis-

ability plan, approved by the Division of Employment Security, Department of Labor and Industry. *N. J. S. A.* 43:21-32. Kazala was an assistant superintendent in the employ of Prudential until he stopped work in October 1951. He had decided late in August 1951 to change his employment and apply for a real estate salesman's license. He filed a license application on October 10, 1951 and on the same day sent a letter of resignation to Prudential, effective October 29, 1951. Thereafter, he took the real estate salesman's examination and received his license. On October 23, 1951 he ceased working for Prudential. That same day he was treated by his family physician who testified that he prescribed cardiac medication and sent him to a cardiologist. The latter found that plaintiff was suffering from myocardial arteriosclerosis, with anginal syndrome. He recommended that Kazala cease work immediately and rest for three months, but he did not testify directly that Kazala at any time was so incapacitated as to be disabled from performing any duty pertaining to any employment.

Prudential's private plan contained two significant clauses. The first, in Part I, called for disability payments more liberal in amount, inception and duration than those under the State Plan for disability (*N. J. S. A.* 43:21-38 *et seq.*), if the employee was "wholly disabled * * * so as to be prevented from performing any and every duty pertaining to any occupation for remuneration or profit * * *." The second, under Part II, provided that notwithstanding anything in the policy to the contrary, an employee like Kazala would be qualified for whatever benefits would be payable under the State Plan but for his coverage under the private plan. The statutory formula for disability payments under the State Plan was disability "resulting in his total inability to perform the duties of his employment." *N. J. S. A.* 43:21-29. The court found the provisions of Part I of the private plan to be more stringent, since they rendered ineligible an employee where he was unable to perform *any* duty pertaining to *any* occupation. The court distinguished *Nickolopulos v. Equitable Life Assurance Society,* above,

113 *N. J. L.* 450, observing that in Kazala's case inability to perform the duties of his employment was expressly covered by the benefits allowable under Part II of the private plan incorporating the statutory provisions of the State Plan, and it would therefore do violence to the wording of Part I to hold that the phrase there used meant disability to perform only the duties of his employment with Prudential, or mere partial disability to engage in any other occupation. As for Kazala's contention that the language of Part I was comparable to the provisions in the *Gross* and *Booth* cases discussed above, the court pointedly noted that both these cases dealt with specific contractual language clearly related to the insured's employment, and so were not applicable. The court also considered Kazala's contention that Prudential's private plan was within the principles expressed in the *Woodrow* case. After quoting from that case and the contractual language there employed, the Supreme Court stated that the Prudential contract was more restrictive, for it defined disability to exist only where a full-time employee was disabled from performing any duty pertaining to any occupation, and that the "obvious intendment of this language is to foreclose resort to benefits by an employee who is able to perform any duties, even part-time, in any occupation." It held the *Woodrow* case not applicable to Part I.

Although not entitled to the more liberal benefits under Part I, Kazala was held to be entitled to the benefits under the statutory formula provided by Part II, the record containing evidence from which it might reasonably be inferred that his condition totally disabled him from performing the duties of his employment as staff manager for Prudential.

The first coverage afforded by Part A of the policy under consideration is comparable to that under Part II in the *Kazala* case. The second coverage under Part A, giving recovery for total disability after the first 12 months if the insured is "wholly and continuously disabled and prevented * * * from engaging in each and every occupation or employment," is comparable to Part I of the *Kazala* coverage. Accordingly, as in the *Kazala* case, if plaintiff is able to

perform substantially the duties of *some* occupation, defendant is not obligated to pay him total disability beyond the 12-month period provided under the first coverage in Part A of the present policy. Although plaintiff is able, with some help from his secretary and wife, to manage and direct his electrical contracting business, he admittedly can no longer function as a working electrician (a major aspect of the business) because of his useless right arm. Under the liberal construction given to the first coverage in Part A by cases like *Gross, Booth* and *Kazala,* he is entitled to 12 months' total disability payments.

However, he is not entitled to further total disability benefits after the expiration of this period, in light of the *Kazala* case and particularly in view of the third provision of the policy, contained under Part B dealing with partial disability: "continuously disabled and prevented from performing one or more of the important duties of his occupation." He does carry on the duties of an occupation which is almost as remunerative to him as his occupation before the accident, *viz.,* that of a supervising and managing electrical contractor. This occupation does not require him to do the manual work of the trade. His ability to function in this occupation precludes the continuing applicability of the second coverage clause of Part A.

Plaintiff's occupation since the death of his father in 1950 has, as stated, clearly been that of an electrical contractor. Although an important duty connected with that occupation was unquestionably that of working electrician, there were other important duties—obtaining jobs, directing his employee or employees, obtaining supplies and equipment, billing and collecting for work done and, when possible, supervising work on the job. Plaintiff is still able to do these in large part, and such disability as he has would therefore be covered under the partial disability provision. He will be entitled to 40% of the monthly indemnity, but not for more than three consecutive months, upon the termination of the 12-month period of total disability.

Some stress has been placed upon the holding in *Peterson v. Hartford Accident and Indemnity Co.,* 32 *N. J. Super.* 23 (*App. Div.* 1954). *Peterson* is clearly distinguishable on its facts. The policy was much like the one here in question. Plaintiff, a carpenter, had fallen from a girder 20 feet above the ground. The insurer paid total disability for 52 weeks and for more than a year beyond that date, after which it paid partial disability for 26 weeks. Upon termination of these payments plaintiff instituted action to recover the difference between the partial and total disability benefits allegedly due him, claiming that he was wholly disabled from engaging in any occupation or employment for wage or profit. The evidence was that as a result of the accident plaintiff's wrist was deformed, there were hypertrophic productive changes in the right elbow, he still complained of his abdominal injuries, there were osteo-arthritic changes of traumatic origin in both hands, and he had Sudek's atrophy of both wrists. There was also testimony that plaintiff had suffered a traumatic neurosis so marked as to be characterized as manic-depressive, rendering him unable to fulfill any work of any kind. The uncontroverted testimony was that plaintiff had not been employed since the accident. There was some proof by defendant that Peterson had been seen driving a car, lighting a pipe, drying dishes and shoveling snow, and its medical expert expressed the opinion that he was able to do some minor things in industry, possibly as a watchman or door checker, but probably would never be able to return to work as a carpenter. The trial judge found in plaintiff's favor, and his judgment was affirmed on appeal.

The facts in *Peterson,* as observed by the Appellate Division (temporary part), were radically different from those in *Kazala,* just as they are completely different from those here involved. Had the facts approximated those in *Kazala,* the court in *Peterson* would clearly have had to apply the views expressed by the Supreme Court in that case.

Part VI of the policy provided that when, as the result of injury, plaintiff was confined in a hospital, defendant would, in addition to any other indemnity, pay him a monthly

hospital indemnity of $100 per month "for the period of such confinement, not· to exceed three months." Plaintiff was in the hospital 57 days, or 1.9 months, and was therefore entitled to receive $190. This has been paid; nothing more is due him under the hospital indemnity clause.

In summary, plaintiff is entitled to total disability for no more than 12 months in all, and partial disability at the 40% rate for three additional months. Judgment accordingly.